IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| MALLIE KAYE ROHUS, ET AL. | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:06-CV-094-Y |
| | § | |
| PARKER COUNTY, TEXAS, ET AL. | § | |

ORDER PARTIALLY GRANTING MOTION TO DISMISS
OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT

Plaintiffs Mallie Kaye Rohus and Pamela J. Hardy are former employees of the Parker County Tax Assessor's office ("the tax office"). They have brought suit against defendants Parker County and Parker County Tax Assessor-Collector Larry Lippincott under 42 U.S.C. §§ 1983 and 1988 for violations of their rights under the First, Fifth, and Fourteenth Amendments to the U.S. Constitution and for common-law retaliatory discharge. Plaintiffs' claims are based on their allegations that Lippincott harassed and retaliated against them and other employees in the office because he believed they supported his political rival in the election of the Parker County Tax Assessor-Collector.

Parker County and Lippincott have filed a motion (doc. #45) to dismiss or, in the alternative, for summary judgment asserting, among other grounds, that Lippincott is entitled to qualified immunity against Plaintiffs' claims and Parker County is entitled sovereign immunity from the common-law retaliatory-discharge

claim.[1]  After review, the Court concludes that Defendants' motion

should be GRANTED.


I.   Factual Background

     Plaintiffs Rohus and Hardy were employed at the Parker County

Tax Assessor's office until 2004.  Rohus began her employment in

1993 in the Weatherford, Texas, office.  Hardy began her employment

in the same office in 1997.  They both worked for Marjorie King who

was then the elected Parker County Tax Assessor-Collector.

     Lippincott was elected Parker County Tax Assessor-Collector in

2000 after defeating King.  Lippincott ran for re-election and

---

[1] Plaintiffs' original complaint asserted claims against Parker County and
Lippincott in his official capacity only.  In response, Defendants filed a motion
to dismiss asserting, among other grounds, that Lippincott should be dismissed
from this case since a suit against an official in his official capacity is the
same as a suit against the entity sued.

     Plaintiffs responded by filing a motion for leave to file an amended
complaint so they could assert their claims against Lippincott in his individual
capacity as well as in his official capacity.  The Court granted Plaintiffs'
motion and Plaintiffs filed their first amended complaint against Lippincott
"individually and in his capacity as Parker County Tax Assessor . . . ." (Pls.'
Am. Compl. at 1.)

     In his amended answer, Lippincott claimed qualified immunity.  As a result,
the Court directed Plaintiffs to file a reply under Federal Rule of Civil
Procedure 7(a).  In their Rule 7(a) reply, however, Plaintiffs claimed that they
had "sued . . . Lippincott in his official capacity only" and that "therefore,
[his] . . . defense of qualified immunity is . . . inapplicable." (Pls.' Rule
7(a) Reply at 1.)  Also, Plaintiffs responded to Defendants' motion to dismiss,
again asserting that they had "sued . . . Lippincott in his official capacity
only . . . ." (Pls.' Br. at 1.)

     In light of the fact that Plaintiffs specifically sought leave from the
Court to amend their original complaint for purposes of making their suit against
Lippincott one against him individually and not just officially, the Court will
disregard Plaintiffs' belated claim that their amended complaint alleges claims
against him in his official capacity only.  Accordingly, the Court will treat
Plaintiffs' amended complaint as a suit against Lippincott in his individual
capacity.

again defeated King in the March 2004 primary election. Lippincott went on to run unopposed in the general election and was subsequently re-elected.

After being first elected in 2000, Lippincott retained all but one of the employees in the tax office. Rohus and Hardy were among the employees retained.

In January 2003, Lippincott promoted Hardy to the position of chief deputy. Following his 2004 re-election, Lippincott promoted Hardy to the dual role of chief deputy and deputy in charge of county-wide operations. Lippincott states that "the chief deputy is an individual upon whose loyalty I relied, and I placed my trust and confidence in this individual." (Defs.' App. at 3.)

Hardy was involved in a car accident in the summer of 2004 that required her to miss work for a few weeks to recover. During her absence, Lippincott appointed another employee, Jenny Gentry, to take over Hardy's duties. Lippincott contends that after Hardy returned to work, she was troubled by the fact that Gentry had been performing her job in her absence. Lippincott states that it came to his attention that Hardy believed Gentry was trying to take her job. Lippincott states that Hardy twice came to him and told him that she would resign if he did not transfer Gentry to another office. Lippincott states he accepted her resignation upon the second occasion. Lippincott claims that, "At no time prior to Hardy's resignation did [he] ever threaten her employment, nor did

[he] have any intention of terminating her employment." (*Id.*)

Lippincott also promoted Rohus on two occasions after he had been elected. In May 2002, he promoted Rohus to section supervisor in the office's dealer-services section. But Lippincott claims Rohus exhibited disruptive behavior in this role. As a result, Lippincott states he transferred Rohus to the Springtown, Texas, office and promoted her to substation supervisor in April 2004.

Lippincott claims that after she assumed her position in the Springtown office, Rohus continued to have problems being disruptive and claims her performance was poor as set out in her December 21, 2004, annual performance appraisal. Lippincott indicates that based on her poor performance, he did not believe that Rohus possessed the proper skills or temperament to be a supervisor. Acting under the Parker County policy on discipline, Lippincott transferred Rohus back to the Weatherford office and demoted her back to her original position.[2] In a letter dated January 7, 2005, Lippincott explained to Rohus his reasons for the demotion in considerable detail.

After her demotion, Lippincott contends Rohus exhibited a lack

--------

[2] The policy provides in relevant part,

> Each supervisor shall have the authority to administer discipline to employees in his/her department . . . .
>
> Depending on the severity of the situation, discipline may range from informal counseling up to and including immediate termination.

(Defs.' App. at 25.)

of respect for the chief deputy and was insubordinate. On January 12, 2005, Lippincott issued Rohus a written warning for insubordination for taking a ninety-minute lunch in violation of office policy and for responding to the department chief deputy in a less-than-respectful tone. (Defs.' App. at 14.) Rohus was cautioned, "Because insubordination is a serious matter, the following action was taken today: verbal notification and written warning issued. Today's actions constitute level one of a three level progressive disciplinary program." (*Id.*)

Rohus's side of the story is that on January 12, she did not hear Lippincott direct that the employees take only one hour for lunch. But two days before, Lippincott alleges, he circulated a memo to all employees stating that all lunch breaks were to be one hour long, and that no employee could be late returning from lunch. Rohus apparently initialed the memo, acknowledging that she had read it.

On January 14, 2005, Lippincott issued Rohus her second written warning alleging she spoke negatively about the office to customers. The warning cautioned Rohus, "If you continue to speak negatively about this department, or your supervisor, . . . or your coworkers, you may be subject to discharge." (*Id.* at 19.) On her warning, Rohus protested, "I disagree with this matter completely . . . . I was not speaking negatively about the department." (*Id.*)

Then, on February 4, 2005, Lippincott reports he issued Rohus her third and final written warning for insubordination. Lippincott claims that Rohus "engaged in a confrontation with her supervisor, the Chief Deputy, in front of other employees and customers." (Defs.' App. at 5.) The warning recounted Rohus's "continuing . . . resistence to or defiance of the authority of the chief deputy of this department." (*Id.*) As it was with her response to her previous warning, Rohus stated her disagreement and contended that her "response was not meant as an insubordination . . . ." (Pls.' App. at 23.)[3]

Lippincott fired Rohus five days later, on February 10, citing her failure to meet performance and conduct expectations. Lippincott submits he had no alternative but to terminate Rohus's employment because "her insubordinate acts and demonstrated attitude issues were damaging the morale and effectiveness of the" office. (*Id.*)

Lippincott categorically denies ever asking Hardy or Rohus to report on which employees in the office voted for his opponent in either the 2000 or 2004 election. Lippincott submits that he is unaware who, if anyone, Hardy supported in the 2004 election for Parker County Tax Assessor-Collector. He unequivocally states, "I never had any belief that Rohus voted for my opponent in that

---

[3] Rohus submitted the affidavit of her coworker, Carla Jones, who states that from December 2004 until Rohus's termination in February 2005, she never witnessed any disruptive or confrontational behavior or insubordinate conduct on the part of Rohus. (Pls.'s App. at 23.)

election, nor would this fact make any difference in how I treated Rohus as an employee of the [office.] Whether Rohus even voted, or who she voted for, did not play a role in any employment decision I made regarding Rohus. Rohus was neither disciplined, nor terminated for how she voted." (*Id.*)

Rohus alleges that in January 2001 and after Lippincott had been elected, "one of the trailer dealers" took her and two other employees out to lunch. (Pls.' App. at 2.) When they returned, Lippincott called them into his office and questioned why they had gone to lunch with the dealer. Rohus states they explained to Lippincott that the dealer took them to lunch "as their appreciation for doing a good job for them." (*Id.*) She states Lippincott "questioned the dealer's motive and wanted to know if the dealer wanted us to run against him for tax collector in the future." (*Id.*)

Then in December 2003, Rohus claims, Lippincott asked her if she knew who had filed to run against him in the 2004 primary. She replied that she did not know, whereupon Lippincott told her that King had filed. She says that, in January 2004, Lippincott called her into Hardy's office and voiced his concern that the employees in the Springtown office did not support him.

Rohus admits that Lippincott moved her to the Springtown office to be the supervisor in April 2004. A few months later, Rohus states she requested a meeting with Lippincott to discuss a

certain employee's disrespectful conduct. She says she met with Lippincott in Hardy's office and claims he began by interrogating her and accusing her of having an under-the-table-agreement with King to publicly support Lippincott but privately support King. (*Id.*) Rohus claims she could tell that Lippincott was fishing to learn who she voted for, but states she refused to tell.

During this meeting, Rohus states she discussed an employee named Terri Schwartz and told Lippincott that she was a good employee and had great customer skills. Rohus claims Lippincott responded that "she might be a good girl, but who did she vote for in the 2004 primary for Parker County Tax Assessor?" (*Id.*) Rohus states she told Lippincott that she did not know how anyone voted and that she considered that a private matter. She states that after this meeting, Lippincott took away her chamber-of-commerce luncheon privileges and told her that henceforth she had to take a half day of vacation to attend the monthly luncheons.[4] She states that Lippincott did not inform her that he was unhappy in any way with her performance.[5]

Hardy alleges that a week after one of the two elections

---

[4] Lippincott denies he took away Rohus's "chamber privileges." Lippincott claims, "no employee, . . . including . . . Rohus, has never had the privilege to attend chamber of commerce luncheons and/or other events as part of an employee benefit package or job description." (Defs.' App. at 6.)

[5] Rohus speculates that Lippincott no longer trusted her because he believed that she voted against him in the 2004 election. She also states that after this meeting, their "relationship was not the same . . . ." (Pls.'a App. at 5.) Rohus fails to offer any competent summary-judgment evidence to support her speculation nor does she provide examples of how her relationship with Lippincott changed.

involving Lippincott, he came to her and asked if she knew how everyone in the office voted. Hardy then claims that about a month after the 2004 primary election, Lippincott came into her office, shut the door, and told her that he believed that two employees, Paula Cook and Kaye Rohus, did not vote for him. Hardy claims that Lippincott confided in her that he heard "from a very reliable source" that Rohus supported King. (*Id.*) Hardy alleges he told her that King had promised to give Rohus "the chief deputy job" if she won the election. (*Id.*)

Hardy states that when Lippincott fired Teri Shaw-Henderson in April 2004, he told Hardy that "those girls in Springtown did not vote for him and he believed that they voted for . . . King." (*Id.* at 13.) Hardy claims that Lippincott told her that "since he almost lost his job, why should he allow anyone who did not vote for him to keep their job." (*Id.*) Hardy claims that by "those girls in Springtown" he was referring to Teri Shaw-Henderson, Terri Schwartz, and Karen Thompson Kennington. She states that several days after he fired Shaw-Henderson, Lippincott demoted Kennington.

Hardy claims that she and Rohus tried to persuade Lippincott to promote Schwartz to Springtown supervisor. Hardy states that he asked them "who we thought . . . Schwartz voted for in the primary election of 2004." (*Id.*) Hardy states that she and Lippincott later met with Schwartz because Schwartz wanted to ask Lippincott about being promoted to the Springtown supervisor position. Hardy

states that "Lippincott asked . . . Schwartz who she voted for in the 2004 primary election" and she states that Schwartz refused to tell him. (*Id.*) After the meeting, Hardy claims, Lippincott "came to my office and asked me what I thought about [Schwartz's] answers to his questions about who she voted for in the 2004 primary election . . . ." (*Id.*) Hardy claims that Lippincott told her that he did not believe Schwartz had voted for him and that he would not promote anyone that he believes did not vote for him. Hardy states, instead, Lippincott told her "he was placing [Rohus] in Springtown temporarily because he wanted someone over there he could trust." (*Id.*)

Hardy states that in July 2004 she and Lippincott met with Rohus to discuss a problem Rohus said she was having with an employee in the Springtown office. Hardy stated that during the meeting, Lippincott asked Rohus about having an under-the-table agreement with King. Hardy states that Lippincott then asked Rohus who she thought Schwartz voted for in the primary election.

According to Hardy, after this meeting Lippincott told her that he thought Rohus did not vote for him and that he no longer trusted her. Hardy also alleges that he told her that "since he almost lost his job in the 2004 primary, why should he allow anyone who did not vote for him to keep their job." (*Id.*) Hardy contends that prior to this meeting, Rohus had received excellent evaluations.

Hardy states that Lippincott constantly had closed-door conversations with her about politics. She describes Lippincott dividing a piece of paper in half and, on one side, listing the employees he believed supported King and, on the other side, listing the employees he believed supported him. Sometimes, she claims, Lippincott would draw a line from a name across the paper indicating that he now believed that employee had changed her allegiance and no longer supported him. He would say, according to Hardy, "I believe you have gone to this side [indicating King]." (*Id.* at 13-14.)

Hardy claims that Lippincott told her that he believed that Paula Cook, another employee in the office, supported King in the election. Hardy states that while she was out of the office recovering from her injuries from her car accident, Lippincott emailed her seeking her advice on moving Cook to the front counter. In September, Hardy states that Lippincott told her that he was ready to fire Cook but that he first wanted to talk to Cook about the way she voted. Hardy states she admonished Lippincott that "he cannot do that, that it is against the law and she [Cook] can sue

him if he were to let her go."[6]  (*Id.* at 14.)

Hardy alleges that she "had to do [Lippincott's] dirty work by being mean and unfair to the girls that he [was] retaliating against." (*Id.*)  She claims that Lippincott made her treat Rohus, Cook, and Schwartz differently because he believed that they did not vote for him.

Hardy admits that when she was out of the tax office recovering from her injuries from a car accident, Lippincott had Gentry fill in for her.  During this time, Hardy alleges Gentry and Lippincott became very close.  After she returned, Hardy states that Lippincott conducted their evaluations together and that they "looked exactly alike." (*Id.* at 16.)  Hardy protested and told Lippincott that she thought it was inappropriate for him to do her evaluation together with Gentry's.

Hardy told Lippincott that he had caused a problem between Gentry and her.  Hardy told Lippincott that Gentry "was a trouble maker, she lies to make everyone look bad, she lies to me . . .,

---

[6] Cook claims that in May 2004, Lippincott called her into his office and "point blank asked me who I voted for in the [office] for my opponent in the 2004 primary election . . . ." (Pls.'s App. at 18.)  Cook states she refused to tell him and that prior to this conversation, she had received good evaluations from Lippincott.

Lippincott states that Cook was a former employee of the office who "openly campaigned during office hours in the [office] for my opponent in the 2004 . . . election." (*Id.*)  Lippincott admits to counseling Cook that it is "a violation of Parker County policy to engage in political activity while on duty." (*Id.*)  Rather, Lippincott submits Cook approached him to request approval to be transferred to another Parker County department.  Lippincott maintains he approved the transfer request and Cook subsequently transferred to another department.  Lippincott denies ever demoting Cook or terminating her employment.

she has very poor customer service [skills], and she causes chaos in the office." (*Id.*) Hardy admits she told Lippincott that she would leave if he did not move Gentry to another office. When Lippincott refused, Hardy tendered her resignation. Hardy admits that because Lippincott refused to move Gentry, she "decided it would be [in her] best interest to resign." (*Id.*)

II.  Analysis

A.   Summary-Judgment Standard

When the record establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," summary judgment is appropriate. FED. R. CIV. P. 56(c).  An issue is considered "genuine" if "it is real and substantial as opposed to merely formal, pretended, or a sham."  *Bazan v. Hidalgo Cty.*, 246 F.3d 481, 489 (5th Cir. 2001) (citing *Wilkinson v. Powell*, 149 F.2d 335, 337 (5th Cir. 1945)). Facts are considered "material" if they "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  To determine whether there are any genuine issues of material fact, the Court must first consult the applicable substantive law to ascertain what factual issues are material.  *Lavespere v. Niagra Mach. & Tool Works*, 910 F.2d 167, 178 (5th Cir. 1990).  Next, the Court must review the evidence on those issues, viewing the facts in the light most favorable to the nonmoving party.  *Id.*; *Newell v. Oxford Mgmt. Inc.*, 912 F.2d 793, 795 (5th Cir. 1990); *Medlin v. Palmer*, 874 F.2d 1085, 1089 (5th Cir. 1989).

In making its determination on the motion, the Court must look at the full record including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits.  *See* FED. R. CIV. P. 56(c); *Williams v. Adams*, 836 F.2d 958, 961 (5th Cir. 1988).

Rule 56, however, "does not impose on the district court a duty to sift through the record in search of evidence to support" a party's motion for, or opposition to, summary judgment. *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992). Thus, parties should "identify specific evidence in the record, and . . . articulate" precisely how that evidence supports their claims. *Forsyth v. Barr*, 19 F.3d 1527, 1536 (5th Cir. 1994). Further, the Court's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249.

To prevail on a summary-judgment motion, the moving party has the initial burden of demonstrating that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. *See Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986). A defendant moving for summary judgment may submit evidence that negates a material element of the plaintiff's claim or show that there is no evidence to support an essential element of the plaintiff's claim. *See Celotex Corp.*, 477 U.S. at 322-24; *Crescent Towing and Salvage Co. v. M/V Anax*, 40 F.3d 741, 744 (5th Cir. 1994); *Lavespere*, 910 F.2d at 178.

To negate a material element of the plaintiff's claim, the defendant must negate an element that would affect the outcome of the action. *See Anderson*, 477 U.S. at 247. If the defendant moves for summary judgment alleging no evidence to support an essential

element of the plaintiff's claim, the defendant need not produce evidence showing the absence of a genuine issue of fact on that essential element. Rather, the defendant need only show that the plaintiff, who bears the burden of proof, has adduced no evidence to support an essential element of his case. *See Celotex*, 477 U.S. at 325; *Teply v. Mobil Oil Corp.*, 859 F.2d 375, 379 (5th Cir. 1988).

When the moving party has carried its summary-judgment burden, the respondent must go beyond the pleadings and by his own evidence set forth specific facts showing there is a genuine issue for trial. *Arbaugh v. Y&H Corp.*, 380 F.3d 219, 222 (5th Cir. 2004) (citing *Celotex*, 477 U.S. at 324); *see also* FED. R. CIV. P. 56(e). This burden is not satisfied by creating some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *See Anderson*, 477 U.S. at 249-50.

B.  Discussion[7]

    1.  Plaintiffs' First Amendment Claims[8]

Section 1983 provides for a cause of action against individuals or entities acting under color of state law who have deprived a person of any right, privilege, or immunities secured by the Constitution and laws of the United States.  *See* 42 U.S.C. § 1983; *McClendon v. City of Columbia,* 305 F.3d 314, 322 (5th Cir. 2002)(en banc).  To the extent a plaintiff seeks money damages from public officials personally for actions taken under color of state law, the officials may invoke their right to qualified immunity. *See Hafer v. Melo*, 502 U.S. 21, 26 (1991).  Public officials performing discretionary functions enjoy immunity from suits for damages, provided their "conduct does not violate clearly estab-lished statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

When addressing the question of qualified immunity, the Court must first determine "whether a constitutional right would have

---

[7]  Defendants have lodged numerous objections to Plaintiffs' summary-judgment evidence.  Defendants' objections to Plaintiffs' exhibits E through H are SUSTAINED for the reasons stated in Defendants' reply.  The remainder of Defendants' objections are OVERRULED.

[8]  Although Plaintiffs also allege violations of their Fifth and Fourteenth Amendment rights, they neither assert nor allege any facts to support a cause of action for anything other than being harassed, discriminated against and terminated from their employment "due to exercising their First Amendment rights in supporting political candidates of their choice."  (Pls.' Am. Compl. at 1.) Therefore, the Court dismisses their constitutional claims to the extent they allege claims under any other provision of the Constitution other than the First Amendment.

been violated on the facts alleged." *McClendon,* 305 F.3d at 322-23; *Saucier v. Katz,* 533 U.S. 194, 200 (2001). "If a violation could be made out . . . ., the next sequential step is to ask whether the right was clearly established." *Saucier,* 533 U.S. at 201. Ultimately, state actors are entitled to immunity if their conduct "was objectively reasonable in light of the legal rules that were clearly established" at the time of their actions. *McClendon,* 305 F.3d at 323.

Cases involving allegations of dismissal from employment based on political motivations are commonly called "patronage-dismissal cases." In establishing a constitutional violation in a patronage-dismissal case, an essential element is that the termination was politically motivated. *See Correa v. Fischer,* 982 F.2d 931, 933 (5th Cir. 1993). Termination of employees "for political reasons is presumptively violative of the First Amendment." *Id.* Usually, "cases finding impermissible patronage terminations involve either an employee's allegiance to a political party, a political candidate, or a political belief." *Id.* at 934. The United States Court of Appeals for the Fifth Circuit has long recognized that the "doctrine applies when an employment decision is based upon support of and loyalty to a particular candidate as distinguished from a political party." *McBee v. Jim Hogg County,* 703 F.2d 834, 838 (1983), *vacated on other grounds,* 730 F.2d 1009 (5th Cir. 1984)(*en banc*)(holding newly elected sheriff who fired employees who

supported former sheriff in election violated First Amendment).

The Court concludes that Lippincott is entitled to immunity from Hardy's claim for patronage discharge because, in her affidavit, Hardy admits that she voluntarily resigned when Lippincott refused to move Gentry, her personal rival, to a different office. Hardy does not allege that she was forced to resign because she supported Lippincott's opponent for Parker County Tax Assessor-Collector. Instead, Hardy claims that Lippincott and Gentry became very close while she was out of the office recuperating from her car accident, and she informed Lippincott of her disapproval of their close relationship when she returned. Hardy claims that she told Lippincott that Gentry was a trouble maker, a liar, has poor customer-service skills, and caused chaos in the office. Hardy admits that she presented Lippincott with an ultimatum that she would resign if he did not move Gentry to another office. True to her word, when Lippincott refused, Hardy resigned.

It is undisputed that Hardy did not get along with or care for Gentry. Hardy's affidavit is rife with personal attacks against Gentry that she fails to support with any competent summary-judgment evidence. The record here clearly shows that Hardy's voluntary resignation was motivated by her personal animosity towards Gentry and her disapproval of the close relationship Gentry enjoyed with Lippincott. Moreover, while Hardy claims that

19

Lippincott forced her to mistreat various employees in the tax office because he believed they did not vote for him, she never claims or alleges that she suffered any adverse-employment action from Lippincott due to any perception of who she voted for or supported. "In the context of patronage dismissals, the First Amendment protects only those victims who are wounded on the political battlefield." *Correa,* 982 F.2d at 935. It does not apply when an employee's voluntary resignation was motivated by personal animosity toward another employee.

The Court concludes, however, that Rohus has raised a genuine issue of material fact as to whether her perceived support and vote for King was a substantial or motivating factor in Lippincott's adverse-employment actions against Rohus. *See Kelly v. Leesville,* 897 F.2d 172, 175 (5th Cir. 1990). Neither party disputes that it is clearly established law that taking adverse-employment actions against employees, including termination, presumptively violates the First Amendment if it was for political reasons. *Correa,* 982 F.2d at 933. It is also clearly established that the First Amendment protects against retaliation when an employee supports a specific political candidate. *McBee,* 703 F.2d at 838.

A public employer may escape liability by establishing that it would have taken the same adverse employment action regardless of the protected First Amendment conduct. *See Gonzales v. Dallas County,* 249 F.3d 406, 412 (5th Cir. 2001); *Mt. Healthy City Sch.*

*Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977).

> *Mt. Healthy* may be properly construed as creating an affirmative defense because it allows the defendant to avoid liability once the plaintiff has carried his burden of proving that an improper consideration was a substantial or motivating factor in the defendant's adverse employment action by proving that it would have taken the same adverse employment action even in the absence of the improper consideration.

*Brady v. Fort Bend County,* 145 F.3d 691, 712 (5th Cir. 1998). In the context of qualified immunity, the analysis is whether it would have been objectively reasonable for a public official to conclude that the adverse employment actions taken by Lippincott did not violate Rohus's First Amendment rights. *Gonzales,* 249 F.3d at 412.

The Court begins its analysis by accepting as true Rohus's and Hardy's allegations that Lippincott regularly asked them if they knew who others in the tax office had voted for, that he voiced concern that employees in the Springtown office did not support him, that he accused Rohus of having an under-the-table agreement with his political rival, and that he questioned why he should promote or allow any employee to retain her job if she did not vote or support him. The Court also accepts as true both Rohus's and Hardy's claim that prior to Lippincott's stating that he did not think Rohus had voted for him, Rohus received good evaluations and that Lippincott told Rohus that she was doing good work.

It is undisputed that Rohus received three disciplinary write-ups from Lippincott before having her employment terminated. But

the Court concludes that there is a genuine issue of material fact as to whether Lippincott's perception of who Rohus had supported and voted for was a substantial or motivating factor in these disciplinary write-ups. None of the three disciplinary write-ups, accepting Rohus's facts as true, reflect any particularly egregious conduct on her part. She has provided detailed and reasoned explanations regarding each incident that, if accepted as true, could reasonably prompt an inference that Lippincott's true motivation was his political animosity toward Rohus. Taken together, the evidence Rohus has presented raises a genuine issue of material fact as to whether political animosity toward Rohus was a substantial or motivating factor in Lippincott's adverse employment actions against Rohus. And the Court concludes that an objectively reasonable public official, having to accept the competent summary-judgment evidence submitted by Plaintiffs as true and drawing all inferences most favorable to them, would conclude that the adverse employment actions taken against Rohus violated her First Amendment rights. Therefore, the Court concludes that Lippincott is not entitled to qualified immunity against Rohus's First Amendment claim.

2.	Hardy's Common-Law Retaliatory Discharge Claim

In the amended complaint, Hardy alleges that she "was demoted and retaliated against because she refused to commit an illegal act under Texas law." (Pls.' Am. Compl. at 12.) Hardy alleges that "Lippincott enlisted [her] to retaliate against the employees in the . . . office that he perceived had voted against him." (*Id.*) Hardy also alleges, "Defendants had a custom and policy to retaliate against employees who held political beliefs, affiliations, expressions, and support of candidates perceived to be hostile or indifferent to Lippincott." (*Id.*) Hardy contends, "Such retaliation is prohibited by Texas Election Code §§ 161.007 [and] 276.001." (*Id.*)

Presumably, Hardy is alleging a common-law retaliatory discharge claim, which is an exception to the employment-at-will doctrine. This is a "narrow exception [that] covers only the discharge of an employee for the sole reason that the employee refused to perform an illegal act." *Sabine Pilot Service, Inc. v. Hauck,* 687 S.W.2d 733, 735 (Tex. 1985).

In Texas, "a governmental unit is immune from tort liability unless the legislature has waived immunity." *Dallas County Mental Health & Mental Retardation v. Bossley,* 968 S.W.2d 339, 341 (Tex. 1998). The plaintiff bears the burden to demonstrate a waiver of sovereign immunity. *See Salazar v. Lopez,* 88 S.W.3d 351, 353 (Tex.App.—San Antonio [4th Dist.] 2002, no pet.). "Sovereign

23

immunity includes both immunity from suit and immunity from liability." *Loyd v. ECO Resources,* 956 S.W.2d 110, 122 (Tex.App.——Houston [14th Cist.] 1997, no writ). Whether a governmental entity is entitled to immunity is a question of law. *See TML Intergovernmental Emple. Benefits Pool v. Prudential Ins. Co. of America,* 144 S.W.3d 600, 604 (Tex.App.——Austin [3rd Dist. 2004, pet. denied).

Here, the Court concludes that Parker County and Lippincott (to the extent Lippincott has been sued in his official capacity) are entitled to sovereign immunity against Hardy's common-law retaliatory discharge claim. *See Cloud v. McKinney,* 228 S.W.3d 326, 333 (Tex.App.——Austin 2007, no pet.)("If an individual is sued in his official capacity, the employee may raise any defense that would be available to his employer, including the defense of sovereign immunity."). Hardy has not alleged any facts or made any attempt to demonstrate an affirmative waiver of governmental immunity (in fact, Hardy did not even respond to this portion of Defendants' argument). "The Texas legislature generally has not waived the sovereign immunity of counties for wrongful termination suits." *Salazar,* 88 S.W.3d at 353 (holding no waiver of sovereign immunity for a *Sabine-Pilot* claim). And absent legislative consent or a statutory exception, sovereign immunity bars Hardy's suit against Parker County and Lippincott acting in his official capacity. *See Carroll v. Black,* 938 S.W.2d 134, 135

(Tex.App.—Waco 1996, writ denied)(holding governmental officials have sovereign immunity against *Sabine-Pilot* claim); *see also University of Texas Med. Branch v. Hohman,* 6 S.W.3d 767, 777 (Tex.App.—Houston [1st Dist.] 1999, pet. dism'd w.o.j.)(holding "*Sabine-Pilot* exception to the doctrine of employment at will does not supercede the State's right to assert sovereign immunity"); *Redmon v. Dallas Area Rapid Transit,* No. 3:00-CV-0218-R; 2001 U.S. Dist. LEXIS 576 *3 (N.D.Tex. Jan. 22, 2001)("The *Sabine-Pilot* exception to at-will employment doctrine does not supercede the State's right to assert sovereign immunity.").

### 3.   Parker County

As mentioned above, Lippincott enjoys qualified immunity from the patronage-discharge claim of Hardy. "A municipality," however, "generally is immune from constitutional tort liability unless such liability arises out of the execution of an official policy or custom of the municipality." *Allison v. Tarrant County,* 92 F. Supp. 2d 601, 603 (N.D.Tex. )(Means, J.). To put it another way, before a municipality will be susceptible to liability for a constitutional tort, a plaintiff must establish that a constitu-tional deprivation occurred and prove that a policy, practice, or custom of the municipality was the moving force behind the plaintiff's suffering that constitutional deprivation. *See Delano-Pyle v. Victoria County,* 302 F.3d 567, 574 (5th Cir.

2002)("Municipal liability under [section] 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom."). "A single action by a municipal officer possessing final policymaking authority regarding the action in question constitutes official policy of the municipality . . . ." *Allison,* 92 F. Supp. 2d at 603; *see also Cozzo v. Tangipahoa Parish Council-President Gov't,* 279 F.3d 273, 289 (5th Cir. 2002)("[A] final decisionmaker's adoption of a course of action [even if tailored to a particular circumstance and not intended to control in other situations] may, in some circumstances, give rise to municipal liability under [section] 1983.").

Hardy's claim against Parker County for patronage discharge rests, solely and fatally, on the actions of Lippincott and on the theory that his actions constituted the official policy of Parker County because he possessed final policymaking authority for the tax office. There is no dispute that Lippincott possessed final policymaking authority for the tax office.

As discussed thoroughly above, Lippincott is entitled to qualified immunity because Hardy have failed to allege a violation of her First Amendment rights. This is because Hardy failed to show that she suffered any adverse-employment action. Thus, even if Lippincott is the final policymaker for the tax office such that his conduct would constitute the official policy of Parker County,

with no underlying constitutional violation committed by him, Parker County cannot be held liable for having an official policy, practice, or custom that was the moving force behind the First Amendment violation of Hardy. With no constitutional deprivation to link to an official policy, there can be no municipal liability. Therefore, Parker County is entitled to summary judgment in its favor on the First Amendment claim of Hardy.

### 4. Supplemental Jurisdiction

Plaintiffs' complaint contains two claims, one pursuant to section 1983 for a violation of First Amendment rights and, the second, a common-law retaliatory discharge claim under Texas law brought only by Hardy. The Court enjoys supplemental jurisdiction over Hardy's state-law claim because that claim is "so related" to her federal claim. *See* 28 U.S.C. § 1367(a). Section 1367, however, permits a district court to decline to exercise supplemental jurisdiction when "the district court has dismissed all claims over which it has original jurisdiction . . . ." 28 U.S.C. § 1367(c)(3).

The Fifth Circuit has stated that the "general rule is to dismiss state claims when the federal claims to which they are pendent are dismissed." *Parker & Parsley Petroleum Co. v. Dresser Industries,* 972 F.2d 580, 585 (5th Cir. 1992). Indeed, the Fifth Circuit has noted that when a district court has eliminated the

27

federal claims at an early stage in the litigation, "the district court has a powerful reason to choose not to continue to exercise jurisdiction." *Id.* Therefore, having concluded that Parker County and Lippincott are entitled to summary judgment in their favor over Hardy's First Amendment claims and that Parker County and Lippincott, to the extent he was sued in his official capacity, are entitled to sovereign immunity from Hardy's common-law retaliatory discharge claim under Texas law, the Court concludes that it should decline to exercise supplemental jurisdiction over her remaining state-law claim asserted against Lippincott in his individual capacity.[9]

---

[9] Hardy's claim for common-law retaliatory discharge does not make clear whether she is asserting that claim against Lippincott in his individual capacity. Assuming she is, the Court declines to exercise supplemental jurisdiction over that claim and dismisses it without prejudice.

III. Conclusion

For the foregoing reasons Defendants' motion to dismiss or, in the alternative, for summary judgment is GRANTED. Plaintiffs' First Amendment claims are dismissed with prejudice. Hardy's common-law retaliatory discharge claim against Parker County and Lippincott in his official capacity are dismissed with prejudice. Hardy's common-law retaliatory discharge claim against Lippincott in his individual capacity is dismissed without prejudice.

SIGNED March 31, 2008.


_____
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE